**Sharon KARIBIAN, Plaintiff,**

v.

**COLUMBIA UNIVERSITY, John Borden and Mark Urban, Defendants.**

**No. 91 Civ. 3153 (TPG).**

United States District Court, S.D. New York.

June 28, 1996.

---

Elizabeth Koob, Koob & Magoolaghan, New York City, for Plaintiff.

Cliff Solomon, Corwin Solomon & Tanenbaum, P.C., New York City, for Defendant Urban.

Diane Wilner, Wilner & Associates, P.C., New York City, for Defendants Columbia and Borden.

## OPINION

GRIESA, Chief Judge.

This is an action to recover damages for alleged sexual harassment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., and state law. Plaintiff Sharon Karibian brought suit against the alleged perpetrator, Mark Urban; against Columbia University, the former employer of Karibian and Urban; and against John Borden, a vice president at Columbia. The action has been tried. The jury returned its verdict on February 13, 1996, and certain of the parties have made post-trial motions.

### The Issues At Trial

The issues in the case were narrowed somewhat during trial, leaving the following claims of Karibian to be decided, some by the jury and some by the court, as will be described.

(1) Karibian claimed that Urban sexually harassed her by engaging in unwelcome sexual activities with Karibian and indicating to her that she would receive employment advantages if she submitted and disadvantages in her employment if she did not. Karibian claimed that she in fact was benefitted in her employment while submitting to Urban's sexual demands and suffered detriment after she discontinued the relationship. Karibian also claimed that Urban retaliated against her because she complained to Columbia.

(2) Although it was conceded that Urban was not personally liable under Title VII, Karibian claimed that Urban was liable under the New York Human Rights Law, Executive Law § 296, both for his sexual harassment and his retaliation against Karibian for complaining.

(3) Karibian claimed that Columbia was liable under both Title VII and the New York Human Rights Law because Columbia was responsible for the sexual harassment and retaliation committed by Urban, and because it retaliated against her for complaining and failed to take reasonable investigative and remedial measures.

(4) Karibian claimed that Borden was liable under the New York Human Rights Law because he retaliated against Karibian for complaining and failed to take reasonable investigative and remedial measures.

Appropriate questions were submitted to the jury. In response, the jury found that Urban did not commit sexual harassment against Karibian, nor did he retaliate against Karibian for making a complaint. The jury further found that neither Borden nor Columbia retaliated against Karibian for complaining. The jury found that Borden did not fail to take reasonable investigative and remedial measures. However, the jury found that Columbia did fail to take reasonable investigative and remedial measures.

As will be described more fully at a later point, it was conceded that, under the particular circumstances of this case, if Urban was found to have committed sexual harassment, Columbia would be automatically liable under Title VII. This was one of the rulings in an earlier appeal in the present case. *Karibian*

*v. Columbia University,* 14 F.3d 773, 780 (2d Cir.1994). However, there was disagreement about whether this would be the case under the New York Human Rights Law. Columbia contended that it would be liable under the Human Rights Law only if it had notice of Urban's wrongdoing and acquiesced in or condoned it. In order to take into account Columbia's position, the jury was asked whether Columbia had notice of, and acquiesced in or condoned, sexual harassment by Urban. Despite the fact that the jury answered the question about Urban's sexual harassment in the negative, the jury answered the question about Columbia's notice of and acquiescence in or condoning of Urban's sexual harassment in the affirmative. This seeming contradiction was cleared up when the jury answered a supplemental question and indicated that its answer to Question 2 meant that it found that Columbia had notice of a *complaint* by Karibian beginning at the date referred to. Thus the jury did not intend to state that Columbia had notice of actual sexual harassment by Urban, but only notice of Karibian's *then version,* which the jury has now rejected based on the evidence at trial.

The following are the questions addressed to the jury and the jury's answers:

1. Do you find that Urban committed sexual harassment against Karibian?

Yes ___ No _x_

2. Do you find that Columbia had notice of, and acquiesced in or condoned, Urban's sexual harassment beginning in September 1988?

Yes _x_ No ___

The following questions relate to the events subsequent to Karibian's complaint to de la Osa in January or February 1990.

3. Do you find that Urban retaliated against Karibian for making her complaint?

Yes ___ No _x_

4. Do you find that Borden unlawfully failed to take reasonable steps to determine the facts about Karibian's complaint and take appropriate remedial action?

Yes ___ No _x_

5. Do you find that Columbia unlawfully failed to take reasonable steps to determine the facts about Karibian's complaint and take appropriate remedial action?

Yes _x_ No ___

6. Do you find that Borden retaliated against Karibian for making her complaint?

Yes ___ No _x_

7. Do you find that Columbia retaliated against Karibian for making her complaint?

Yes ___ No _x_

The supplemental question, asking for clarification of the answer to Question 2, was as follows:

2A. Does your answer to question 2 mean that you find that Columbia had notice of a complaint by Karibian of sexual harassment beginning in September 1988?

Yes _x_ No ___

The jury found damages against Columbia in the amount of $150,000 for lost earnings, and $300,000 for pain and suffering.

Prior to the time Title VII was amended in 1991, there was no right of jury trial under that statute. It was conceded that the pre-amendment law applied in this case. It was assumed by the parties and the Court that therefore Karibian's Title VII claim would be decided by the Court, while the Human Rights Law claims would be decided by the jury. While the jury was deliberating, the Court announced its ruling that Karibian had not proved the Title VII case against Columbia on any basis and that the Title VII claim should be dismissed (Tr. 2158–65). Subsequent to this and prior to the jury verdict, Karibian's attorneys submitted a brief indicating that, where a Title VII claim is tried along with a New York Human Rights Law claim, both claims having the same elements, the Court should apply the jury verdict on the Human Rights Law claim to the Title VII claim. *See Song v. Ives Laboratories,* 957 F.2d 1041, 1048 (2d Cir.1992). The present status of the Court's Title VII ruling will be discussed later in this opinion.

## The Post–Trial Motions

Both Karibian and Columbia have made post-trial motions. Karibian's applications are as follows:

(1) Karibian moves under Fed.R.Civ.P. 50(b) for judgment as a matter of law, setting aside the jury's answer to Question 1 and finding that Urban committed sexual harassment.

(2) In the event that Motion (1) is denied, Karibian moves under Rules 50(b) and 59 for a new trial on the issue of Urban's alleged sexual harassment because the jury's answer to Question 1 is in conflict with the jury's answers to Questions 2, 2A and 5.

(3) Karibian moves under Rules 50(b) and 59 for a new trial on the issues of Urban's alleged sexual harassment and retaliation, claiming that the Court erred in excluding some of the proffered testimony of Susan Xenarios; that the Court erroneously failed to order the production of certain documents in discovery; and that there were errors in the Court's instructions to the jury.

(4) Karibian moves under Rule 50(b) for judgment as a matter of law, setting aside the jury's answer to Question 7 and finding that Columbia engaged in retaliation.

Karibian has made no motions regarding Borden.

Columbia moves under Rule 50(b) for judgment as a matter of law, setting aside the jury's answers to Questions 2 and 5, and setting aside the award of damages against Columbia. In the alternative, Columbia moves for a new trial on these issues.

## Summary of Rulings

The court denies all of Karibian's motions.

The court grants Columbia's motion for judgment as a matter of law, and in the alternative grants Columbia's motion for a new trial.

## Discussion

### Karibian Motion (1)

There is no basis whatever for granting judgment as a matter of law setting aside the jury's answer to Question 1. The weight of the evidence strongly favored the jury's finding that Karibian had not proved sexual harassment committed against her by Urban.

### Karibian Motion (2)

Prior to instructing the jury, the court had extensive discussions with counsel about the issues to be decided. The first and most important issue in the case was obviously whether Urban had committed sexual harassment. This issue was embodied in Question 1. If Urban was guilty of this misconduct he would be personally liable under the New York Human Rights Law, although he would not be personally liable under Title VII. As to Columbia, although it was conceded that, in the event the jury found sexual harassment by Urban, Columbia would be automatically liable, Columbia argued that it would be liable under the Human Rights Law only if it had notice of Urban's wrongdoing and acquiesced in or condoned it. Columbia's position was supported by cases such as *Totem Taxi v. New York State Human Rights Appeal Board,* 65 N.Y.2d 300, 491 N.Y.S.2d 293, 295, 480 N.E.2d 1075, 1077 (1985); and *Goering v. NYNEX Information Resources Co.,* 209 A.D.2d 834, 619 N.Y.S.2d 167, 168 (1994). Karibian argued that, on the issue of whether Columbia would be liable for sexual harassment committed by Urban, the standard under the Human Rights Law should be the same as under Title VII, citing *Zveiter v. Brazilian National Superintendency of Merchant Marine,* 833 F.Supp. 1089, 1095 (S.D.N.Y.1993). Karibian went on to cite the holding of the Second Circuit in an earlier appeal in her own case, in which the Court ruled that Columbia would be liable under Title VII for Urban's sexual harassment without any showing of notice. *Karibian v. Columbia University,* 14 F.3d 773, 780 (2d Cir.1994).

Although it may be that ultimately the New York courts will bring their interpretation of the Human Rights Law in line with the interpretation of Title VII in *Karibian,*

they have not yet done so. Indeed, the Third Department's decision in *Goering v. NYNEX, supra* came after *Karibian* but did not cite the latter case.

In any event, it was obviously necessary to pose a question to the jury in line with current New York law. Thus, Question 2 was included, which asked whether Columbia had notice of and acquiesced in or condoned the sexual harassment committed by Urban. The time of September 1988 was selected as referring to the first occasion on which Columbia might arguably have had notice.

The intention in asking Question 2 was not to have the jury revisit the issue of Urban's sexual harassment dealt with in Question 1. It was simply to ask about Columbia's conduct in the event of an *affirmative* answer to Question 1.

This intention was not made sufficiently clear to the jury, and the jury answered Question 2 even though it had answered Question 1 in the negative. The jury's answer to Question 2 was in the affirmative.

■ Nevertheless, it must be concluded that, whatever significance the answer to Question 2 may have, the jury did not intend to contradict its answer to Question 1. The Court's instructions in regard to Question 2 dealt solely with the issue of what would constitute sufficient notice to Columbia. Columbia argued that the persons Karibian spoke to at Columbia in September 1988 were bound to keep the communications confidential and that therefore these communications were not sufficient notice. Karibian argued that the communications were not confidential. The Court discussed with the jury at some length the idea that notice to Columbia would need to be the type of communication which Columbia could act upon in some corrective manner.

During its deliberations, the jury submitted the following inquiry. "Does Question 2 ask us to determine if Sharon Karibian's 9/16/88 meeting with Ruth Curtis was or was not official notification?" Then, for a second time, the Court explained at length the meaning of "notice" and its relationship to confidentiality.

After the jury reported its answers to the various questions, there was a discussion of the possible conflict between the answer to Question 1 and the answer to Question 2. Karibian's attorney proposed certain alternative supplemental questions designed to deal with the problem. The Court did not use any of these in their exact form. The Court drafted its own Question 2A, asking if the jury's answer to Question 2 meant that it found that Columbia had notice of a complaint by Karibian of sexual harassment beginning in September 1988. This question was suggested by the fact that the jury had made an affirmative answer to Question 5, finding that Columbia had failed to take reasonable steps to determine the facts about Karibian's complaint and had failed to take appropriate remedial action. Although Question 5 referred to the period subsequent to January or February 1990, the answer to Question 5 still suggested the possibility that, in answering Question 2, the jury was really referring to Karibian's *complaint* rather than to actual sexual harassment committed by Urban. In submitting Question 2A, the Court instructed the jury as follows (Tr. 2202–3):

THE COURT: The reason I am calling you back at the moment is in respect to question 2. You answered question 1 with a No and the question was, do you find that Urban committed sexual harassment against Karibian? The answer was, No.

Then, as far as Urban, later, do you find that Urban later retaliated against Karibian for making the complaint. The answer was, No.

The answers about—the other answers were No except for 5 and you said—that question was, do you find that Columbia unlawfully failed to take reasonable steps to determine the facts about Karibian's complaint and take appropriate remedial action?

Now, I assume that you did not mean to make any inconsistent answers. I have a right to assume that as a judge but I want to just get a clarification.

In light of your answer to 5 about whether Columbia unlawfully failed to take reasonable steps to determine the facts

about Karibian's complaint and take appropriate remedial action, you recall I told you that even though you didn't find on the basis of the evidence in this trial actual sexual harassment committed by Urban, there could still be a problem, a legal problem, if Columbia failed to take action on the basis of the complaint; in other words, what was known to it at the time.

Do you recall that instruction? I think I am going to ask you to just retire briefly and I am sure this can be brief, and I am going to ask you a question called question 2A. It is as follows:

Does your answer to question 2 mean that you find that Columbia had notice of a complaint by Karibian of sexual harassment beginning in September 1988?

■ Where there is a view of the case that makes the jury's answers to special interrogatories consistent, the court must adopt this interpretation. *See Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines*, 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962). Such an interpretation is not difficult to arrive at in the present case. It is perfectly apparent from the record as a whole and from the jury's answer to Question 2A that the jury had no intention whatever of finding for Urban in response to Question 1 and then contradicting itself in answering Question 2. The answer to Question 2, as clarified, is not relevant to the issue of whether Urban committed sexual harassment, but only to the issue of Columbia's notice of a *complaint*.

For these reasons the court denies Karibian's request for a new trial based on the claim of a contradictory verdict.

*Karibian Motion (3)*

*The Xenarios Testimony*

■ As already described, the jury not only found that Karibian had not proved her case of sexual harassment against Urban, but the jury also found that Karibian had not proved that he retaliated against her for making the complaint. Karibian now seeks a new trial on the ground that the court improperly refused to admit certain testimony by Susan Xenarios. Although this evidence is claimed to relate mainly to the sexual harassment claim, it is also contended that

the evidence relates to some extent to the claim of retaliation.

Xenarios is a clinical social worker, who counsels victims of trauma, particularly those who have suffered sexual abuse and battering. She teaches and writes on these and related subjects, and has testified as an expert in rape cases. Xenarios treated Karibian in 1990 and 1991 and saw her again in 1995 in preparation for the trial.

Karibian sought to have Xenarios testify on three subjects: (1) about what Xenarios observed of Karibian during the treatment; (2) on the issue of damages, particularly with reference to Xenarios's opinion of Karibian's current condition and future prognosis; and (3) Xenarios's opinion as to the reluctance of people to make complaints about sexual harassment (Tr. 956–61). In response to defense objections, the court ruled that Xenarios would be permitted to testify as to the first and second subjects, but not as to the third (Tr. 1315–19).

Essentially what the court had in mind was the fact that testimony about the reluctance of people to complain about sexual harassment would involve such an oversimplification of the issue that it would be of no real help to the jury and could be misleading. There was a lengthy and complex record about what Karibian had said to various persons regarding her relationship with Urban. Certain evidence about what she told these people about what happened with Urban was drastically inconsistent with her testimony in court, and Karibian had sought to avoid admitting making the prior inconsistent statements. In order to assess the relevance of the proposed Xenarios testimony to all this, it is appropriate to describe the record in some detail.

Karibian's relationship with Urban commenced in the fall of 1987. Karibian testified at the trial that there were two instances of forced, violent sexual intercourse, or attempted sexual intercourse, occurring in March and May 1988. She testified that activities of a sexual nature, undesired by her, continued until September 1988, after which there was a hiatus until early 1989. Then, according to Karibian's testimony, Urban again started making sexual demands upon her, and she

engaged in various forms of sexual activity with him until about April 1989. Karibian testified that, although the sexual activity with Urban ceased about April 1989, he resented the termination of the relationship and took various steps detrimental to her in her employment.

Karibian sought the assistance of Dr. Joan Yager, a clinical psychologist employed by the Mental Health Division of Columbia University Health Services. Karibian made eight visits to Yager between June 2, 1988 and August 4, 1988. The first visit was within a few days of what Karibian testified was the second violent sexual encounter. Yager made detailed notes of these visits, the accuracy of which cannot be seriously questioned. The version which Karibian presented to Yager was far different from the version told in court. The problem, as described in detail to Yager, was Karibian's anxiety about being able to hold Urban as a boyfriend. She told Yager that a previous boyfriend had compared her unfavorably to another woman, and she indicated that Urban had spoken in the same terms. Karibian expressed concern about becoming attached to men who became unavailable to her, and who would withdraw from her. Karibian spoke of having to pursue Urban, stating that he did not call her unless she called him, and saying that she put all the energy into the relationship. Karibian said nothing about Urban making unwelcome advances to her or holding out benefits or detriments in the employment relationship in order to impose his will upon her. She spoke of no force or violence in connection with the sexual relationship.

Columbia had a panel of persons who could be consulted in sexual harassment situations. One member of the panel in 1988 was Mary Murphy, who was Deputy Vice President for Student Services. Karibian had a meeting with Murphy in September 1988. Murphy did not make notes of the meeting, but testified as to her memory of it. Murphy testified that Karibian explained that she was having a relationship with a man who was working at the University. According to Murphy, Karibian made it clear repeatedly that she had willingly engaged in this rela-

tionship, but she now wished to terminate it and was concerned that it would have an impact on her job. According to Murphy, Karibian mentioned nothing about coercion or violence. Murphy testified that she discussed with Karibian certain options as to how to deal with the problem—including talking directly to the man involved about her concerns, writing a letter to him about these concerns, going to the Equal Opportunity Office for informal counseling and mediating, and instituting a formal grievance procedure. Murphy testified that these options did not seem to appeal to Karibian. She told Karibian that if she could handle the problem in her own way, that would of course be an achievement.

Much earlier in the case Karibian had testified about her sessions with Yager. Karibian testified that in those talks she felt embarrassed, and that she did not feel comfortable with Yager. Her testimony made it appear that she said very little to Yager about her relationship with Urban. Karibian went so far as to say that Yager never asked Karibian about what brought Karibian into Yager's office, and that most of Yager's questions were about her family, her relationship with her father, and previous relationships with men.

Karibian had also testified about her visit to Murphy—that she told Murphy that she had had a sexual relationship with her boss; that now it was over and suddenly her hours were being decreased; and that she was trying to find out if there was anything she could do about this. Karibian said nothing in her testimony about telling Murphy whether the relationship was willing or unwilling. Karibian denied that Murphy outlined any possible remedies. According to Karibian, Murphy simply said that office relationships of this kind happen all the time, and that when Karibian gained experience working she would become accustomed to this kind of thing.

A few days after seeing Murphy, Karibian went to Ruth Curtis, an employee at Columbia's Equal Opportunity Affirmative Action Office. The evidence about Karibian's discussion with Curtis will not be described in detail here. It is sufficient to say at this

point that Karibian testified that she told Curtis that she was pressured into a sexual relationship. Curtis took no steps in response to what Karibian said to her. Curtis testified at the trial that this was because the communication was confidential, something Karibian denied.

The course of events after September 1988 has been briefly summarized above. It is necessary to add at this point that in February 1990 Karibian made a complaint of sexual harassment to Gertrude de la Osa at Columbia, and this complaint was relayed to a number of other people at Columbia.

What has just been set forth is a summary of the relevant parts of the record as it stood at the time Karibian's attorneys proposed to have Xenarios testify.

With reference to the proposal to have Xenarios testify about the reluctance of people to make complaints about sexual harassment, the real issue presented by the evidence at trial was not about Karibian's reluctance to speak. She did voluntarily speak to Yager, and then to Murphy and Curtis, commencing relatively early in the relationship and within days of what she alleged was a violent sexual encounter. Karibian's attorneys were not oblivious to this, and it was obvious that the real purpose of the proposed testimony of Xenarios was to try to have Xenarios explain away the devastating conflicts between Karibian's statements to Yager and Karibian's court testimony. But Karibian herself had been given the opportunity to confront these conflicts and to explain them, if they could be explained. She had had the opportunity to say what she wished to say about her emotional state at the time of the sessions with Yager, and to give an explanation in her own way of how this affected her various statements to Yager. To a certain extent she did this, but mainly she *failed to confront* what she had said to Yager. She in effect attempted to deny saying to Yager most of what was actually said.

The Court was of the view that the proposed expert opinion of Xenarios about the emotional state of persons subjected to sexual harassment would not be helpful to the jury in view of the particular nature of what Karibian had said both in and out of court and in view of the fact that the essential issues were within the standard realm of factors relating to credibility.

While the jury was deliberating, and while the Court was preparing to rule on the Title VII issues, the Court requested both Karibian and Urban to take the stand for further questioning by the Court. In connection with the motion here under consideration, the testimony of Karibian is particularly significant. Although the jury did not hear the testimony, any jury sitting in a new trial would surely hear this type of testimony.

The Court wished to have a precise record as to what Karibian admitted saying to Yager and what she did not admit. The Court examined Karibian based on the Yager notes. The result of this examination is nothing short of astounding. Karibian admitted saying to Yager those things which were consistent with her position in court. She flatly denied saying those things which were inconsistent. For instance, she denied telling Yager that men withdraw after you like them; that Urban and a previous boyfriend, Tim, pulled back after she decided she liked them; that she seemed to pick unavailable men whom she wanted to make more available to her; that she hoped that being nice to a man would bring him around; that part of her attraction to Urban was that he was her boss (she denied saying she was *attracted* to him); and that she had to put all the energy into the relationship. Karibian did not claim that these statements were made because of a mental disturbance of some kind. She flatly denied making them. It must be said that there is no way in which these denials can be considered credible.

As to her talk with Murphy, Karibian denied saying that she willingly engaged in the relationship. She further contradicted Murphy's testimony about suggesting a number of options to deal with the problem posed by Karibian.

At some point after the case was submitted to the jury, the attorneys for Karibian requested that the Court hear the testimony of Xenarios on the subject matter which had been excluded by the Court. The idea was

that the Court was dealing with the Title VII claim without a jury, and could be more liberal in receiving evidence for the Court's own use. The Court could give the testimony as much weight, as little weight, or no weight, as it saw fit after hearing the testimony.

Over the objections of defense counsel, the Court did hear further testimony from Xenarios. This occurred about two weeks after the jury completed its work. The record shows that, by this time, the Court regarded the testimony as also being an offer of proof of what would have been presented to the jury if Xenarios had been permitted to testify to the full extent proposed by Karibian's attorneys.

The principal purpose of this renewed Xenarios testimony was to deal with the Yager material. Xenarios was confronted with a number of the items in the Yager notes which contradicted Karibian's position in court. Xenarios attempted to explain them by saying that Karibian was in a bad mental condition—was embarrassed, confused and disorganized—when she went to see Yager. However, when it came to the specific points in the Yager notes, the Xenarios testimony was woefully lacking in cogency. Asked about the notation of Karibian saying that men withdraw after you like them, Xenarios had no explanation other than assuming that Yager's note was wrong. As to Karibian's statement that Urban and a prior boyfriend pulled back after Karibian decided she liked them, Xenarios was asked how that fitted in with Karibian's claim in court. The answer of Xenarios was simply unintelligible. Xenarios was asked about the Yager notation regarding Karibian having to put all the energy into the relationship. Xenarios explained why Karibian would say this—because women who are abused will often exert effort to make things better. The trouble is that this was one of the statements Karibian denied ever making to Yager.

Xenarios admitted that, in preparation for both her earlier testimony before the jury and this later testimony to the Court, she had reviewed medical records, including the Yager notes, but had not reviewed the evidence about the statements made to Murphy, to Curtis and to others at Columbia, and had not reviewed Karibian's testimony before the jury and to the Court. After summarizing this testimony, the Court asked if it would have any effect upon the views of Xenarios. Xenarios said, "Absolutely not," and proceeded to give a lengthy explanation in which she failed entirely to deal with the testimony the Court was inquiring about.

At the conclusion of this session the court reiterated its view that the proposed testimony of Xenarios had been properly excluded (Tr. 2256–59).

Fed.R.Evid. 702 governs the admissibility of expert testimony. It states:

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court held, under Rule 702, that a trial judge must decide on the admissibility of proffered expert scientific evidence by assessing whether the reasoning or methodology underlying the testimony is scientifically valid and whether the reasoning or methodology properly can be applied to the facts at issue. *Id.* at 592, 113 S.Ct. at 2796. The latter consideration is another way of expressing the requirement of Rule 702 that the testimony must assist the trier of fact to understand the other evidence in the case or to determine a fact at issue. *Daubert, id.* at 595, 113 S.Ct. at 2797–98, makes it clear that the judge must be mindful of other applicable rules, including Rule 403, which allows exclusion of relevant evidence

... if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The Second Circuit has affirmed a district court's exclusion of expert testimony in a case analogous to the present one. Although

decided before *Daubert*, it is entirely consistent with its principles. In *U.S. v. DiDomenico*, 985 F.2d 1159 (2d Cir.1993), the defendant was accused of transporting stolen property, and proposed to call a psychiatrist to testify that the defendant suffered from "dependent personality disorder" and thus did not know that the property was stolen. The defendant herself had testified about her strong emotional ties with a man who had acquired the stolen property, and had further testified that she did not know the nature of the property when she assisted him in disposing of it. The expert testimony was proffered to give a clinical corroboration to the defendant's testimony. The district court sustained an objection to the testimony, and the court of appeals affirmed, holding that the imprimatur of a clinical label was neither necessary nor helpful for the jury to make an assessment of the defendant's state of mind. The court of appeals noted that there was lay testimony concerning the defendant's emotional state at the time of the crime which was not difficult to assimilate and which addressed a subject matter within the experience of the jury. *Id.* at 1163–64.

In the present case Karibian testified in her own way, as a lay witness, as to why she did or did not make certain statements or complaints to persons at Columbia. She made the admissions, denials and explanations which have already been described. It was, and still is, the view of the Court that the proposed testimony of Xenarios, trying to explain what Karibian said or didn't say on the basis of opinion about her emotional state, was not necessary nor would it have been helpful for the jury, and indeed would have been unduly prejudicial.

The motion for a new trial on the basis of the exclusion of the Xenarios testimony is denied.

### The Documents

■ Prior to trial, Columbia objected to the production of certain documents from its files on the ground of attorney-client privilege. The Court examined these documents *in camera*. The Court overruled Columbia's objection as to certain portions of these documents, and sustained the objection as to other portions. The material not produced consisted solely of discussion of certain tentative legal conclusions.

Karibian contends that, since these documents were generated in the course of Columbia's investigation, the attorney-client privilege is not applicable. The Court disagrees. The Court believes that Columbia personnel had a right to have privileged discussions with counsel on questions about the possible legal merits of Karibian's claim. Any tentative legal conclusions expressed in these documents, based on incomplete information, could not fairly be considered evidence in the form of admissions or otherwise. Those documents which contained evidence or contained information which might lead to evidence were ordered to be produced.

### Jury Instructions

■ Karibian contends that the Court erroneously instructed the jury by defining an "unwelcome" relationship as one which would be "distinct from welcome, consensual and mutual." This language, which was part of the larger instruction, was discussed with counsel prior to the jury charge. Karibian's attorney agreed with the formulation of the Court at the time, and never lodged an exception to it (Tr. 1993–94).

Karibian contends that the jury was misled into thinking that sexual harassment must occur over some sustained period of time. However, the Court made no such statement. The Court did describe what Karibian claimed—that is, sexual harassment occurring from late 1987 into 1990. One essential purpose of doing this was to make clear that the alleged sexual harassment had two phases: the first being an alleged coerced relationship, and the second being alleged actions taken against Karibian after the termination of the relationship (Tr. 2064–66). At no time prior to the jury verdict was this formulation objected to.

Karibian contends that the jury charge incorrectly indicated that the jury was required to find unwelcome sexual activity, excluding the possibility of liability based solely on acts detrimental to Karibian's employ-

ment perpetrated in response to the cessation of the relationship.

As indicated above, the claim Karibian made in this case was (1) that there was an unwelcome sexual relationship, and (2) that, following the termination of the relationship, Urban took actions detrimental to Karibian in her employment. Karibian never suggested in the slightest degree that the Court should instruct the jury that it was sufficient to find (2) only. Such a suggestion is made for the first time in the post-trial motions.

The Court rules that there is nothing in the arguments about the jury instructions which would justify a new trial.

*Karibian Motion (4)*

There is no basis for granting judgment as a matter of law, setting aside the jury's answer to Question 7. The weight of the evidence is strongly in favor of the jury's finding that Columbia did not engage in retaliation against Karibian because of her making a complaint of sexual harassment.

*Columbia's Motion*

Columbia moves for judgment as a matter of law, setting aside the jury's answers to Questions 2 and 5, and setting aside the award of damages against Columbia. In the alternative, Columbia asks for a new trial on these issues.

The real issue relates to Question 5. The Court asked the jury whether Columbia had unlawfully failed to take reasonable steps to determine the facts about Karibian's complaint and had failed to take appropriate remedial action. The jury answered in the affirmative. It should be noted that there was some difficulty in arriving at the wording of Question 5, and that the Court submitted this question without being certain that it posed a valid issue under the law. However, the Court wished to have the jury make findings on all arguably necessary issues in order to avoid the need for a retrial after appeal. Now that the jury has made its finding in response to Question 5, it is necessary for the Court to make a final ruling on the question of law. It is also necessary to determine whether, if Question 5 is valid under the law, the jury's verdict had a reasonable basis.

*The Legal Issue*

■ The issue of law is whether Columbia can be held liable solely for failing to take reasonable investigative and remedial steps in response to Karibian's complaint of sexual harassment by Urban, where the jury has found no actual sexual harassment committed by him. Karibian contends that there is such liability. Columbia argues that there is not. It will be assumed that the law on this point would be the same under both Title VII and the New York Human Rights Law. *See Zveiter v. Brazilian National Superintendency of Merchant Marine*, 833 F.Supp. 1089, 1095 (S.D.N.Y.1993).

In dealing with this issue, it is necessary to start with the statutory language. Title VII provides:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; . . .

42 U.S.C. § 2000e–2(a)(1). The pertinent language in the New York Human Rights Law is:

1. It shall be unlawful discriminatory practice:

(a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sex, or disability, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

New York Executive Law § 296.

The conduct which violates these provisions is *discrimination*. It is established law that sexual harassment is a form of gender discrimination. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986).

Karibian fails to make any analysis of the statutory language. Obviously, neither of these provisions has any language expressly creating liability for failure to investigate and remedy a complaint of discrimination. No argument is made that such a failure (even though one might deem it reprehensible) constitutes discrimination within the meaning of the statutes. Indeed, so to find would be a most tortured reading, and would in reality be an amendment of the statute rather than a valid interpretation.

Both Title VII and the Human Rights Law go beyond the basic provisions quoted above, but do so in a carefully defined manner. None of the additional provisions contains any language which can be interpreted as creating liability for failure to investigate and remedy a complaint of discrimination. Karibian points to no such language, and there is none. What *is* provided is liability for retaliation. The relevant provision in Title VII is:

§ 2000e–3. **Other unlawful employment practices.**

**(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings**

It shall be unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

The Human Rights Law has two overlapping provisions. The first is Executive Law § 296.1(e), which provides:

1. It shall be an unlawful discriminatory practice:

. . . . .

(e) For any employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this article or because he has filed a complaint, testified or assisted in any proceeding under this article.

The second is § 296.7, which provides:

7. It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article or because he has filed a complaint, testified or assisted in any proceeding under this article.

"Retaliation" is the shorthand for the kind of conduct prohibited in these provisions. No one contends that the failure to investigate and remedy a complaint is, in and of itself, the same as retaliation, or the same as any of the conduct expressly defined in these statutory provisions.

Karibian relies on language in certain decisions to the effect that, where an employee complains of sexual harassment, the employer has an obligation to investigate the allegations and to take remedial steps. *See Waltman v. International Paper*, 875 F.2d 468, 479 (5th Cir.1989); *Snell v. Suffolk County*, 782 F.2d 1094, 1099 n. 4, 1104 (2d Cir.1986); *Watts v. New York City Police Department*, 724 F.Supp. 99, 107 (S.D.N.Y.1989); *Bennett v. New York City Department of Corrections*, 705 F.Supp. 979, 987–88 (S.D.N.Y.1989). But the issue in that line of cases was what action or failure to act on the part of the employer would subject the employer to liability for sexual harassment committed by an employee. In these cases the employer was not deemed to be automatically liable. The reasoning of the courts was that, where one employee sexually harassed another employee resulting in a complaint to the employer, the employer's failure to take reasonable steps to investigate and remedy would be sufficient to cause the employer to be liable for the sexual harassment. The important thing for present purposes is that the rule of law announced in these cases assumed sexual harassment committed by an employee. These cases *did not* postulate some separate heading of liability for an employer where no sexual harassment of an employee had been committed.

The point is that where an employee has committed sexual harassment or some other form of unlawful discrimination, this means that what is prohibited by the statute—*i.e.,* discrimination—has been committed. But the issue is about liability for discrimination, not about liability for some alleged misconduct not covered by the statute.

If what occurs is an employer's failure to investigate and take remedial measures in response to a complaint of discrimination, and if it turns out that no actual discrimination has occurred, then there is nothing which actually constitutes any conduct banned by the statute. Again, one might believe for a variety of reasons that an employer has a moral or ethical duty to investigate and take remedial steps, but this is not the equivalent of a law passed by the Congress or the New York Legislature.

It is necessary to deal with certain other cases cited by Karibian. These are even less helpful to her position than the ones just cited. They do not even have the language about a duty to investigate and remedy. They simply say that an employer, who might otherwise be liable for discrimination committed by an employee, can escape that liability by making a reasonable effort to inquire and remedy. *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 901 (1st Cir.1988); *Katz v. Dole,* 709 F.2d 251, 256 (4th Cir. 1983); *Dortz v. City of New York,* 904 F.Supp. 127, 153 (S.D.N.Y.1995); *Trotta v. Mobil Oil Corp.,* 788 F.Supp. 1336, 1351 (S.D.N.Y.1992); *Carrero v. New York City Housing Authority,* 668 F.Supp. 196, 203 (S.D.N.Y.1987).

Karibian also cites *Bundy v. Jackson,* 641 F.2d 934, 947 (D.C.Cir.1981). This decision did not interpret Title VII as imposing liability for failing to investigate and remedy a complaint. There injunctive relief was being sought to remedy a truly grievous sexual harassment problem. The court ruled that there should be an order directing the employer to take steps to investigate and correct that problem. Finally, Karibian refers to *Herlihy v. Metropolitan Museum of Art,* 214 A.D.2d 250, 633 N.Y.S.2d 106, 109–110 (1995). There is dictum about a duty under Title VII and the Human Rights Law to investigate and act upon complaints. However, this dictum is presented in passing in the course of a discussion on a number of other points. It had nothing to do with the holding in the case, and involved no real analysis of whether a failure to take investigative and remedial measures would create liability under Title VII or the Human Rights Law.

The Court should also note that it does not agree with the conclusions drawn by Columbia from *Arno v. Club Med, Inc.,* 22 F.3d 1464 (9th Cir.1994). However, a detailed discussion of this case is unnecessary since the Court agrees with Columbia's position on other grounds.

Of course, if Congress or the New York Legislature wished to provide for liability for failure to take investigative and remedial measures following a complaint of discrimination, this could be done. Surely such a rule should not be created by the courts in the absence of expressed legislative intention. While superficially it may seem obvious that an employer should have a duty to investigate and remedy, in reality an employer can be faced with a most difficult decision as to what steps should be taken in any given case. A complaint of discrimination involving sexual harassment may be a total fabrication or it may be valid. The present case illustrates the problem vividly. The complaint Karibian made to Columbia was persuasive on its face, but a full presentation of the facts has shed an entirely different light on the complaint, as the jury has found. An employer cannot hold a full trial, and may face serious obstacles in arriving at the facts. There may be further difficulty in fashioning an appropriate remedy which will be fair both to the accuser and the accused.

But it should be realized that, even without a separate heading of liability relating to investigative and remedial measures, an employer will have a strong incentive to do so, despite the difficulties just described. The reason for this is the potential liability of the employer for acts of wrongdoing committed by an employee. Under certain circumstances, such as that presented in the Karibian case, the employer is automatically liable. In such a situation, where a complaint is made, the employer might not avoid liability

for acts of harassment already committed, but the employer would be foolhardy indeed to sit by without attempting to remedy the problem in order to avoid mounting damages. In other circumstances, where the employer may not be automatically liable, such liability may be imposed if actual sexual harassment is later found by the trier of fact and the employer has failed to take reasonable investigative and remedial measures. In such a situation the employer has the strongest possible incentive to put an end to misconduct by the employee.

The Court rules that neither Title VII nor the Human Rights Law provides for liability for failure on the part of an employer to take investigative and remedial measures in response to a sexual harassment complaint, where it is determined that no sexual harassment occurred.

### Factual Record Justifying Judgment as a Matter of Law

Fed.R.Civ.P. 50(a)(1) provides that judgment as a matter of law may be granted against a party on an issue where "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." In the view of the Court, even if the law were such as to impose liability on an employer for failing to take reasonable investigative and remedial measures, the record in this case does not provide a sufficient evidentiary basis for the jury finding against Columbia on this issue.

Before setting forth the evidence, it is necessary to define precisely the factual issue. The relevant question posed to the jury was Question 5, which has already been set forth. It will also be recalled that Questions 3–7 were specifically described in the jury questionnaire as relating to events subsequent to Karibian's complaint to de la Osa in January or February 1990. The proposed questionnaire for the jury was submitted by the Court to the attorneys prior to the time the jury was instructed. Some points on the questionnaire were objected to, with one objection even occurring during the jury instructions. Revisions to the questionnaire were made in response to comments. There was no objection to the time limitation relating to Questions 3–7. Moreover, the designation of January or February 1990 as the starting time relating to these questions was made for good reason. In the view of the Court, there was no real complaint by Karibian under circumstances giving rise to an issue of possible retaliation or under circumstances which would allow Columbia to engage in investigative and corrective measures until early 1990. In connection with a different question of law, as already described, Question 2 was submitted to the jury about "notice" to Columbia. However, there was no argument raised against the position of the Court that Questions 3–7 should relate to the time beginning in early 1990. With regard to Question 5, the time boundary was established and must be adhered to. Columbia has a right to this.

In response to Columbia's motion for judgment as a matter of law, the issue is whether there was a legally sufficient evidentiary basis for a reasonable jury to find that, following Karibian's complaint in January or February 1990, Columbia failed to take reasonable investigative and remedial measures. In dealing with this issue the Court will rely on undisputed facts, unless otherwise noted.

Karibian made her complaint of sexual harassment to Gertrude de la Osa at Columbia, who took notes of a two-hour interview with Karibian on February 20, 1990. For some reason it is not absolutely clear that this was the first occasion in which Karibian spoke to de la Osa. There is some possibility that it may have been slightly earlier.

In any event, de la Osa promptly informed various responsible persons at Columbia, including vice president Borden. Immediate steps were taken both to investigate the complaint and to provide a remedy to Karibian. Obviously, any remedial steps needed to take into account the fact that Columbia was far from certain about the facts.

The first remedial measure was to direct that, in any meeting between Karibian and Urban, another Columbia employee, Veronica Chappelle, would be present. The purpose of this was to safeguard against Urban acting to Karibian's disadvantage in the employ-

ment relationship. However, the Columbia officials quickly reconsidered this and decided to take a more drastic step. They moved Urban completely out of the chain of command over Karibian. Urban was replaced by Chappelle as Karibian's supervisor, and Chappelle reported to Borden. This new arrangement took effect February 23. The evidence is clear beyond any possible question that thereafter Karibian had the opportunity to perform her work entirely free of any actions or decisions or influence on the part of Urban. Also, it will be recalled that no sexual activity had occurred for almost a year. By the time of Karibian's complaint in early 1990, what was being alleged by Karibian was detrimental employment actions by Urban resulting from the termination of the relationship.

Ironically, Karibian was not happy with the new arrangement involving Chappelle. The evidence is uncontradicted that Karibian was at times insubordinate and hostile to Chappelle. Moreover, Karibian refused opportunities for career development. Karibian made known her unhappiness to Borden and others, who also were aware that Karibian was considering commencing litigation about the sexual harassment claim. In mid-April Columbia made an offer to Karibian to relieve her from her work and to give her full salary and benefits through the end of the summer, when she would complete certain courses she was taking at Columbia. Included in these benefits would be the continuation of free tuition. Karibian declined this offer and stated that she wished to continue to work. Columbia had no problem with this, if it was her wish, since her work was satisfactory, even allowing for some degree of discord with Chappelle.

At the same time these events were taking place, Columbia was still investigating the sexual harassment allegations. At Borden's request, Urban produced a lengthy written statement. Borden received this statement on April 16. The statement by no means admitted any coerced or harassing sexual activity or any pressure relating to the conditions of Karibian's employment. The statement did, however, admit that Urban had pursued Karibian romantically, that a sexual

relationship had ultimately developed, and that it extended, with some breaks, until the spring of 1989. The statement described other matters relating to Karibian, including the fact that Urban had helped Karibian obtain compensation for certain hours in September 1987 which Karibian had not actually worked.

On April 19, after reviewing the statement, Borden and the other people at Columbia involved with this matter decided to ask Urban to resign. Borden felt that he had been misled by Urban on an earlier occasion about what was going on between him and Karibian, and Borden and the others took the view at this time that it was improper management on the part of Urban to develop a sexual relationship with his subordinate. Another factor influencing the Columbia people was Urban's involvement in having Karibian paid for unworked hours. On May 2 Borden asked Urban for his resignation, and confirmed this in a letter of that date. The resignation took effect May 4.

It is important to note that Columbia did not at this time, nor did it ever, make a finding that Urban was guilty of sexual harassment.

Karibian expressed pleasure at Urban's being forced out. She continued in her work under the supervision of Chappelle. Indeed, she received a raise in the summer of 1990.

Prior to the time of Karibian's complaint, Columbia was conducting a review of the effectiveness of the project on which Karibian was employed. Karibian worked in telephone fund raising. Although she, Urban, Chappelle, and the others mentioned above were employees of Columbia, they were actually working on a project called Telefund being carried out by an independent contractor named PMI. There had been various objections to the effectiveness of PMI and Telefund. It was ultimately decided by Columbia to discontinue the Telefund operation, at least for a school term. All the Telefund employees were laid off. On June 31, 1990 Chappelle wrote Karibian informing her that her employment would be terminated as of August 17, 1990. The letter stated in part:

Please be sure to call the Employment Office on extension 4–3803 for an appoint-

ment to review and update your resume, so that you may be considered for other employment opportunities within Columbia University.

Karibian took no action in response to this invitation.

At this point it is of interest to refer to the testimony of Chris Miller, one of Karibian's friends. Although the veracity of this testimony is by no means conceded by Karibian, it is surely consistent with the undisputed facts. Miller testified as follows:

Q. Did she ever talk to you about working in the 1990 period, from September 1990 forward?

A. You mean after the position at Columbia was no longer there?

Q. Yes.

A. She planned to draw her full unemployment.

Q. Did she say anything to you as to why she wasn't working in that period?

A. She told me that she didn't want to work. She wanted to spend the time working on her case and, as well, she thought it would look best if she didn't work.

On the issue dealt with in Question 5, it is difficult to understand how Columbia could have done more than it did to investigate Karibian's complaint and to provide remedial measures. When one adds to the facts set forth above the additional circumstance that a jury, after a lengthy trial, has found against Karibian on her claim of sexual harassment, one realizes the difficulty of an employer such as Columbia being in the position of acting without possessing the full facts.

The Court grants Columbia's motion for judgment as a matter of law because there was no reasonable basis in the evidence to support the jury's verdict on Question 5. This ruling covers both the matter of liability and the award of damages. Columbia is also entitled to have the answer to Question 2 set aside. In view of the answers to Questions 1 and 2A, the answer to Question 2 is irrelevant to the issue of whether Columbia is liable for Urban's sexual harassment, no such harassment being found. As to the question of Columbia's possible liability for failure to take reasonable investigative and remedial measures, this issue was posed, in the form agreed to by Karibian, in Question 5. It was not posed in Question 2. Thus Question 2 is of no effect, and indeed should not have been answered by the jury.

### New Trial

In the event of an appellate reversal of this Court's ruling annulling the jury's verdict on Question 5 (and Question 2), the Court would, in the alternative, direct that there be a new trial. The Court believes that, at the very least, the jury's verdict is contrary to the great weight of the evidence and is a manifest injustice.

### CONCLUSION

All applications of Karibian directed against the jury's verdict in favor of Urban are denied. Since the jury found that Urban committed neither sexual harassment nor retaliation, Urban is entitled to judgment dismissing the case as against him.

Since the jury has found no sexual harassment or retaliation by Urban, there is no basis for holding Columbia liable under the New York Human Rights Law for any act of Urban. The Court is in agreement with the findings of the jury on these issues and makes the same rulings under Title VII. Karibian's motions directed against these findings and rulings are denied.

The jury and the Court were presented with the issue of whether Columbia, through persons other than Urban, retaliated against Karibian for making a complaint. The jury found in the negative, thus disposing of this phase of the Human Rights Law claims. The Court is in agreement, thus disposing of the related Title VII claim. Karibian's motions directed against these findings and rulings are denied.

With respect to the jury's finding that Columbia should be liable for not taking reasonable investigative and remedial measures, Columbia's motion for judgment as a matter of law, setting aside this finding, is granted.

Columbia's alternative motion for a new trial on this issue is granted.

SO ORDERED.